```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                         :
ROBERT WATSON,                           :
                       Plaintiff,        :
                                         :     06 Civ. 2214 (DLC)
            -v-                          :
                                         :     OPINION & ORDER
THE LONG ISLAND RAILROAD COMPANY,        :
                       Defendant.        :
                                         :
-----------------------------------------X
```

Appearances

For Plaintiff:
Theresa M. Mahlstadt
Sable & Gold
450 Seventh Avenue
New York, NY 10123

For Defendant:
Mary Jennings Mahon
Walter Johnson III
Law Department
Jamaica Station – Mail Code 1143
Jamaica, NY 11435


DENISE COTE, District Judge:

  Plaintiff Robert Watson ("Watson") brings this action against defendant the Long Island Railroad Company ("LIRR") pursuant to the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq. ("FELA"). Watson seeks damages for injuries from a skin condition which he alleges was caused by the uniform hat he was required to wear in his job as an Assistant Conductor. Following the close of discovery, the LIRR has moved for summary

judgment on the ground that Watson has failed to establish any negligence on the part of his employer.  The motion is granted.

### Background

The following facts are undisputed or are taken in the light most favorable to the plaintiff.[1]  Watson began working as an Assistant Conductor for the LIRR in April 2004.  The terms and conditions of his employment were governed by the Collective Bargaining Agreement ("CBA") between the United Transportation Union and the LIRR.  Prior to beginning work, Watson underwent a physical examination, which he passed.  As part of the examination, Watson filled out a "Medical History Record" in which he responded in the negative to questions asking whether he had ever had "allergies" or "skin conditions."

As an Assistant Conductor, Watson was required to wear a uniform, which included a hat.  As Watson admitted in his deposition, prior to starting work at the LIRR, he had no reason to believe he might be allergic to any part of the uniform, and the LIRR had never received any complaints of injury caused by

---

[1] There is little disagreement between the parties as to the underlying facts in this case.  In fact, the plaintiff, in his 56.1 statement in opposition, has admitted to all of the defendant's 138-paragraph 56.1 statement, and has provided no additional facts in his 56.1 statement in opposition.  Any additional facts he has provided are referred to in his memorandum of law in opposition, with the exhibits supporting these facts attached to plaintiff's counsel's affirmation.

the hat.  A couple of weeks after Watson started wearing the hat, however, Watson started to feel an itching sensation, and in September 2004, he noticed "light spots" on his head.[2]

In May 2005, Watson went to see Dr. Marvin Tankel ("Dr. Tankel") at Atlantic Dermatologic Associates.  Dr. Tankel did not conduct any tests relating to the hat, or conduct any allergy testing on Watson.  Dr. Tankel provided a note to Watson which stated:  "This patient has a scalp dermatitis related to his uniform cap -- He needs to wear a protective headband underneath the cap."  Watson showed Dr. Tankel's note to the Lead Transportation Manager for the LIRR, who sent him to the LIRR Medical Facility.  On May 26, Watson met with Dr. James Tremaroli ("Dr. Tremaroli"), the physician in charge of the Facility.  Dr. Tremaroli approved the use of a protective headband.  Watson claims, however, that he was told by someone that he had to have the protective headband "tucked underneath so nobody could see it," and therefore the hat was still

---

[2] In his memorandum, Watson states that he saw Jeff Chianfagna, a physician's assistant at Capitol Health Management, about his skin in February 2005, and points to excerpts of his deposition transcript that the LIRR included with its submissions.  The portion of the deposition transcript, however, is not included in the excerpts provided by the LIRR, and aside from Watson's affidavit that simply states without elaboration that he received treatment from Jeff Chianfagna, there is no evidence of this specific visit.

touching his skin despite the protective headband.[3]  Watson began to wear a white "do rag" and sweatband under his hat.  As stated in his deposition, he wore white in order to see if any dye or something might be coming off the hat onto his skin, but he never saw any dye come off.[4]

In September 2005, Watson was "instructed by someone from the union to call in sick, so that [he] could be placed on restricted duty."  "Restricted duty" allows represented employees to perform restricted work "when otherwise they would lose time from work due to an injury received on duty or, after the depletion of their sick leave banks, due to a non-job related sickness or injury."  After depleting his sick leave, on October 12 Watson went to the LIRR Medical Facility and requested placement on restricted duty.  He presented a note dated October 8 from the Atlantic Dermatologic Associates that stated, "Because of Mr. Watson's skin condition, he cannot tolerate wearing his hat.  He is to go on restricted duty with no restrictions."  The printed name on the note reads "Mark R. Kahn" ("Dr. Kahn"), Watson's new doctor, but Watson does not

---

[3] Watson could not recall who told him that the protective headband could not show underneath his hat.

[4] Watson states in his deposition that he also saw Dr. Michael Tugelman and Dr. Helen Radoszycki, but has provided no reports from either physician.

remember who signed the note, and the signature on the note is clearly not that of Dr. Kahn.

The request for restricted duty was approved, and the next day Watson began his new assignment as a security officer. He was not required to wear a uniform in this position, and it was "easy work." He continued on restricted duty until January 31, 2006, when Watson presented a new note from the Atlantic Dermatologic Associates to the LIRR Medical Facility. The January 30 note was signed by Dr. Kahn and stated that Watson's skin condition was being treated by phototherapy, and that he could return to work "on light duty." In the meantime, Dr. Tremaroli sent a letter to Watson's doctor and requested that he check off whether or not his skin condition was caused by and/or exacerbated by the hat. Dr. Kahn signed a letter dated January 31, and returned it with a check next to "Mr. Watson's skin condition was not caused by, nor exacerbated by, the conductor's cap." On February 6, Watson was shown the letter and informed that his restricted duty status was terminated and that he was to return to work as an Assistant Conductor.

Watson called in sick and obtained a new note from Dr. Kahn dated February 7, which read, "Patient symptoms clinically made worse with continuous use of a uniform hat. Symptoms clinically appear related to wearing a hat. At this time he can not

5

tolerate wearing a hat."[5]  Watson submitted the new note to the LIRR Medical Facility on February 21.  Based on the conflicting reports, the LIRR sent Watson for an independent medical examination ("IME").  Dr. David Cooper ("Dr. Cooper"), a board certified dermatologist, examined Watson and issued a report on March 23 concluding that Watson's skin condition was neither caused by, nor made worse by wearing the hat.  Although the timing is not entirely clear, Watson also underwent two skin biopsies, as directed by his doctors, but the results of both were "inconclusive."  In the meantime, on March 21, Watson filed the complaint in this action.

    Despite Dr. Cooper's report, Watson refused to return to work.  Under the CBA, a "panel" (or neutral) doctor can be appointed to resolve a dispute between the LIRR and the employee's treating physician.  Under the CBA, the panel doctor's decision is deemed "controlling."  At the LIRR's request, a panel doctor was appointed.  Dr. Barry Solomon ("Dr. Solomon"), a board certified dermatologist, examined Watson and reviewed medical records from the other doctors as well.  Dr. Solomon issued an initial report on May 9 and concluded that he

---

[5] The LIRR argues that the note is inadmissible hearsay.  The note from Dr. Kahn, however, was submitted by the LIRR in support of its motion for summary judgment.  By relying on the note, the LIRR "waived any objections to the admissibility" of the note.  Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005).

saw "no clinical evidence of the hat being the etiology of, or the exacerbating factor in, an evolving and chronic dermatitis on the patient." He did, however, recommend "a patch test of all of the hat materials and dyes as well as an evaluation by an allergist" in order to exclude "an allergic dermatitis, or allergic chemical type-induced vitiligo."

Dr. Stanley Goldstein ("Dr. Goldstein"), a board certified allergist, then examined Watson and conducted patch allergy skin tests, all of which were negative. Dr. Goldstein issued a report on July 6, concluding that "Mr. Watson's scalp, hairline, face, trunk and upper extremities skin condition is not caused by allergic dermatitis secondary to materials in his conductor's hat." Dr. Solomon then issued an amended report on July 11, 2006, concluding that there was "no clinical evidence of the hat being the etiology of, or the exacerbating factor in, an evolving and chronic dermatitis on the patient." Accordingly, Dr. Solomon determined that there was "no reason for Mr. Watson not to be able to physically perform his duties in a full time capacity."

Watson was ordered to return to work on July 14, 2006, but he failed to obey the order. He was charged with

...

insubordination, and after a disciplinary trial where he was represented by the union, he was dismissed on August 2, 2006.[6]

## Discussion

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings.  Rule 56(e), Fed. R. Civ. P.; <u>accord</u> <u>Sista v. CDC Ixis N. Am., Inc.</u>, 445 F.3d 161, 169 (2d Cir. 2006).

---

[6] Watson's union appealed the decision to the LIRR Labor Relations Department, and the appeal was denied.  The union has requested a hearing before a Public Law Board pursuant to the CBA.

FELA is "a broad remedial statute whose objective is to provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer" and is to be "liberally construed" to achieve that objective.  Greene v. Long Island R.R. Co., 280 F.3d 224, 229 (2d Cir. 2003) (citation omitted).  A relaxed standard for negligence and causation applies to cases brought pursuant to FELA.  Williams v. Long Island R.R. Co., 196 F.3d 402, 406 (2d Cir. 1999); see also Nelson v. Metro-North Commuter R.R., 235 F.3d 101, 106 (2d Cir. 2000).  "[A]n employer breaches its duty under FELA if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees."  Williams, 196 F.3d at 406 (citation omitted).  The test is whether the evidence supports "the conclusion that employer negligence played any part, even the slightest, in producing the injury."  Id. at 406-07 (citation omitted).

Watson has failed to show that the hat caused his skin condition.  "Expert testimony usually is necessary to establish a causal connection between an injury and its source unless the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile."  Tufariello v. Long Island R.R. Co., 458 F.3d 80, 89 (2d Cir. 2006) (citation omitted).  The question of whether the uniform hat caused

9

Watson's skin condition is a technical issue that requires expert testimony under Rule 702, Fed. R. Evid., and as this Court advised Watson at a July 14, 2006 initial pretrial conference, and again at a telephone conference on August 17, 2006, the plaintiff had to obtain such a report.  Despite those warnings, Watson failed to provide any expert report by September 15, 2006, the date the plaintiff's expert reports were due.

In opposition to the LIRR's motion, Watson relies on only three exhibits to show causation:  the February 7, 2006 note from Dr. Kahn, a note dated September 2005 from physician's assistant Jeff Chianfagna ("Chianfagna") of Capital Health Management,[7] and a February 16, 2007 letter from Dr. Kahn.  The last document was first disclosed to the defendant with plaintiff's papers in opposition to this motion.

The two notes from Dr. Kahn and Chianfagna cannot substitute for expert testimony.  Under Rule 702, Fed. R. Evid., expert testimony must be "based upon sufficient facts or data" and be "the product of reliable principles and methods." Although treating physicians are allowed "to testify at trial concerning any medical opinions that they formed during the

---

[7] The September 2005 note from Chianfagna reads:  "To whom it may concern, It is in my medical judgment that Mr. Watson should be excused from wearing a hat at his place of employment due to severe dermatologic reaction it is causing."

10

course of treatment with respect to plaintiff's injuries, their cause, and the extent of plaintiff's disability," Figueroa v. Boston Scientific Corp., 254 F. Supp. 2d 361, 368 (S.D.N.Y. 2003) (citation omitted), the two notes are unelaborated. Furthermore, one of the notes is not even from a physician, but a physician's assistant.  To the extent Watson seeks to oppose the LIRR's expert causation evidence, the two notes are insufficient.

In addition, the February 16 letter from Dr. Kahn is not admissible.  The letter states that Watson's skin condition "could very well be as a result of an allergy to a clothing," and that it "could very well be secondary to a contact dermatitis from wearing his uniform."  "As a general matter, . . . unsworn letters from physicians generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment."  Capobianco, 422 F.3d at 55.  Furthermore, it was written a mere week before Watson's opposition was filed, and was not part of discovery:  The July 18, 2006 Pretrial Scheduling Order made clear that plaintiff's identification of experts and disclosure of expert testimony were to occur by September 15, with all discovery to be completed by October 30.  The February 16 letter was never disclosed during the discovery period, and cannot be relied upon now to oppose a motion for summary judgment.

Furthermore, even if the February 16 letter from Dr. Kahn were admissible, it suffers from the same infirmities as the two notes, and does little to aid Watson's position. Even under the liberal standard applied to FELA actions, the two notes from Dr. Kahn and Chianfagna and the February 16 letter from Dr. Kahn fail to raise an issue of fact as to the LIRR's negligence.

## Conclusion

The defendant's motion for summary judgment is granted. The Clerk of Court shall enter judgment for the LIRR and close the case.

SO ORDERED:

Dated:   New York, New York
         April 9, 2007

_____
DENISE COTE
United States District Judge